# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 2 3 2012

JAMES N. HATTEN, Clerk
By _____
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SCJ

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for UNITED SECURITY BANK, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 1:12-CV-3694 ) |
| PIERCE T. NEESE, | ) **JURY DEMAND** |
| Defendant. | ) |

## COMPLAINT

The Federal Deposit Insurance Corporation ("FDIC"), as Receiver ("FDIC-R") for United Security Bank ("USB" or the "Bank"), for its Complaint against Pierce T. Neese ("Neese") states as follows:

## I.   INTRODUCTION

1.   On November 6, 2009, the Georgia Department of Banking and Finance ("GDBF") closed United Security Bank and appointed the FDIC as Receiver.  The loss to the Deposit Insurance Fund is currently estimated at $63.1 million.  Under 12 U.S.C. § 1821(d)(2)(A) and § 1823(d)(3)(A), the FDIC-R has, among other powers, all rights, titles, powers, and privileges of USB, and of account holders, depositors, and stockholders with respect to USB and its assets,

10222153_1.DOC

including, but not limited to, the claims against the former directors and officers as set forth herein.

2.     FDIC-R asserts claims against Neese, former Chief Executive Officer ("CEO") and a director of USB, for negligence and gross negligence in operating and managing the lending function of the Bank. The FDIC-R seeks compensatory damages and other relief as a result of Defendant's tortious conduct (the "Damages").

3.     Neese was charged, among his other duties and responsibilities, with operating and managing the lending function of a community bank. But rather than manage the Bank's lending function in a sound and responsible manner, Neese allowed irresponsible and unsustainable rapid asset growth concentrated in high-risk acquisition, development, and construction ("ADC") loans and purchased loan participations without adequate credit administration and loan underwriting policies and practices to manage the risks, approved loans and the purchase of loan participations, routinely and regularly which violated USB's loan policy and banking regulations, and disregarded regulators warnings regarding lending activities which he knew or should have known would likely cause the Bank to suffer substantial damages.

2

4.     As described in detail below, Neese's negligence and gross negligence in his numerous, repeated, and obvious breaches and violations of the Bank's loan policy and procedures, underwriting requirements, banking regulations, and prudent and sound banking practices is exemplified by 16 loans made between November 10, 2005, and March 27, 2008, which proximately caused Damages to the Bank of an amount to be proven at trial in excess of $6.373 million.

## II.    THE PARTIES

5.     The FDIC is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C.  12 U.S.C. § 1821(d). The FDIC-R is the successor to, among others, all rights, titles, powers, and privileges of USB, and of account holders, depositors, and stockholders with respect to USB and its assets, including, but not limited to, the claims against Neese as set forth herein.

6.     Neese was the CEO and a director of USB from 1974 until the Bank failed.  He was also a member of the Bank's loan committee (the "LC") from its inception on March 22, 2006, until the Bank failed.

3

## III. JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this case, pursuant to 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

8.     This Court has personal jurisdiction over Neese who at all relevant times was a resident of, and conducted the business of the Bank, in the State of Georgia.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial portion of the events and/or omissions giving rise to the claims and Damages asserted herein occurred in this district.

## IV. FACTS

10.     USB, a state-chartered nonmember bank, was headquartered in Sparta, Georgia. The Bank was established in 1932 as a privately owned and operated institution under the name of M. G. Pound Bank. In 1976 the Bank changed its name to United Security Bank.

11.     USB was wholly owned by its holding company, United Security Bancshares, Inc. ("USBI"), a one-bank holding company. On August 21, 2011, USBI was administratively dissolved by the Georgia Secretary of State for failing to file its 2010 Annual Report.

4

## A.     The Bank's Lending Operations

12.     Faced with declining loan demand in the Sparta market, the Bank decided to expand and opened a branch office in Woodstock, Georgia (Woodstock branch) in July 2002 to serve Cherokee, Cobb, and Fulton counties, which are part of the Atlanta metropolitan area.

13.     Coinciding with its geographic expansion in 2002, USB implemented an aggressive loan growth strategy focused on CRE loans, specifically ADC loans, including out-of-state loan participations.

14.     The Bank grew its assets at rates of 36 percent in 2004 and 70 percent in 2005 and that the funded total of ADC lending represented approximately 304 percent of tier 1 capital.

15.     By December 31, 2005, ADC loans were 270.82 percent of USB's total capital compared to 26.73 percent for its peer group. By December 31, 2007, ADC loans were 434.10 percent of its total capital compared to 39.87 percent for its peer group.

16.     The Bank increased its total assets by 500 percent, from $31 million as of December 31, 2002, to $154 million as of September 30, 2009. ADC loans were the primary source of this growth.

17.    CRE and ADC loans are known to be more speculative than other types of loans because of, among other reasons, the lack of present cash flow source, uncertainties of development and sale, and the need for adequate secondary sources of repayment.

18.    Neese knew or should have known that concentrating USB's loan portfolio in ADC/CRE loans increased the bank's risk for numerous reasons, including: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE/ADC concentrations.

19.    Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends impacting the industry and strict adherence to prudent lending policies and standards, all of which Neese and his subordinates repeatedly failed to follow despite regulators' warning and admonitions.

## B.    Neese's Domination of the Bank

20.    The Bank's aggressive ADC/CRE growth strategy was implemented by Neese in 2002. Neese who had a controlling interest in the Bank dominated the

6

Bank's lending and management decisions. He was effectively the Bank's senior credit officer and functioned as a "One-Man Bank" from 2002 until March 22, 2006.

21. Even after establishment of a three-person LC on March 22, 2006 at the direction of regulators, Neese continued to dominate the Bank's lending function due to a lack of sound internal controls, and he functioned, in effect, as the Bank's "one-man" LC until the Bank failed.

22. As an indication of Neese's dominant influence at the Bank, on March 9, 2008, the Bank in a local newspaper advertisement stated, "Meet Our Loan Committee, Pierce Neese." Neese made the loan decisions, sometimes circumventing the two other LC members and other times with the concurrence of the other LC members who "rubber-stamped" his loan approvals.

23. In dominating and usurping the loan approval process, Neese rendered ineffective the controls necessary to ensure prudent loan underwriting and acceptable credit at origination.

## C. Warnings Regarding Overconcentration and Underwriting Deficiencies

24. Between May 11, 2006 and September 24, 2008, regulators repeatedly criticized USB's Board of Directors ("Board") and management for, among other things, violations of the state legal lending limit and appraisal requirements; for

7

deficiencies in credit administration and loan underwriting procedures, including lack of due diligence in loan participations purchased; and for appearing to function with Neese as a one person loan committee.

25.     Regulators also criticized the Bank criticized for the failure of its loan policy to set forth the process for calculating Allowances for Loan and Lease Losses and to define concentrations for credit and appraisal review procedures. As a result of these material deficiencies, regulators concluded that loan policy effectively failed to comply with the real estate lending standards in 12 C.F.R. § 365.2 and Appendix A to Subpart A of Part 365—Interagency Guidelines for Real Estate Lending Policies. Despite knowledge of these warnings and admonitions from regulators, Neese failed to implement appropriate corrective measures.

26.     In addition to failing to heed repeated regulatory warnings, Neese failed to inform himself, recognize and/or appreciate the significance of the decline of key economic indicators, such as a slowing of housing sales and peaking of home prices by early to mid 2006 and the decline of the housing market by the third quarter of 2006 in the Atlanta metropolitan area and continued to approve high risk and speculative ADC and CRE loans, including a number of the transactions which resulted in the Damages.

8

27.     Poor  underwriting and credit administration practices coupled with an economic downturn in the Atlanta metropolitan area contributed to a substantial deterioration of USB's asset quality after 2007.  The Bank's adversely classified assets increased from $4.7 million as of December 31, 2006, to $32.8 million as of March 31, 2009, which resulted in a significant decrease in its regulatory capital.

28.     Due to the deficient underwriting, risk management, and credit administration allowed by Neese in approving CRE loans and loan participations, particularly as real estate markets began to decline in the second half of 2006, the Bank's financial condition deteriorated.  USB failed on November 6, 2009.

**D.     Loan Underwriting and Violations**

29.     USB had specific written policies and procedures, albeit consisting of only nine substantive pages, governing the underwriting, acquisition and administration of loans (the "Loan Policy"). While regulators criticized the Loan Policy as inadequate, it was intended to ensure that the Bank pursued prudent banking practices and to limit the Bank's risk exposure. The relevant Loan Policy provisions include, but are not limited to:

> a. Collateral security should be of a type that can be properly assigned and has good marketability with a clearly adequate margin of value.

9

10222153_1.DOC

b. An application and credit report is required from all new borrowers.

c. Sources of repayment from the borrower and the ability to repay must be identified.

d. A financial statement less than 18 months old is required from the borrower.

e. A certified appraisal is required for loans over $250,000.

f. Purchase of a loan participation requires analysis in accordance with USB's credit standards as if USB originated the loan itself.

g. Loan-to-value ("LTV") ratio limits are 80 percent for new commercial construction loans; 85 percent for residential construction loans; 75 percent for land development loans; and 65 percent for raw land loans.

h. The Bank should decline "undesirable loans," which include loans to persons who operate their own businesses when repayment depends on the profitable operation or liquidation of the business.

30.     Neese's approval authority was the Bank's legal lending limit until January 31, 2007, 15 percent of the Bank's statutory capital base until January 28, 2009, and then $500,000 until the Bank failed. Loan approval authorities were

10

based on the total credit amount outstanding and to be extended to the borrower at the time of approval.

31.    As detailed herein, the Bank suffered substantial damages from significant departures from safe and sound banking practices by Neese. Neese repeatedly disregarded the Bank's Loan Policy and prudent underwriting practices, failed to correct loan underwriting and credit administration deficiencies after being warned by regulators, made credit decisions without being well informed as to the credit risk to the Bank and approved loans and loan participations involving borrowers who were not creditworthy and/or projects that provided insufficient collateral and guarantees for repayment. In doing so, Neese repeatedly engaged in a pattern and practice of approving loans and loan purchases that: 1) violated the Bank's Loan Policy, including, without limitation, the policy provisions in paragraph 30 above; 2) evidenced systematic deficiencies in the credit underwriting, approval, and administration process; and 3) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

32.    By way of example and not by way of limitation, the transactions in attached Exhibit A illustrate the very types of failures, breaches and violations of

11

duty referenced above committed by Neese. Exhibit A sets forth some of the specific material deficiencies and violations for each illustrative transaction. The FDIC seeks compensatory damages and other relief, among other things, as a result of Neese's conduct in approving transactions identified in Exhibit A and described below. (The transactions are identified using initials for privacy reasons. The full names will be identified to Neese.)

33. The following transactions, which are also identified on Exhibit A, exemplify the repeated breaches and violations by Neese:

### 1. Example Transaction with the BSC, LLC[1] Loan

34. On June 15, 2007, the LC approved the purchase of a $2.0 million or 18.6 percent sub-participation interest in Nexity Bank's 77.7 percent participation interest in a $13,835,505 loan from the Bank of Florida. The purpose of the loan was to provide funding to BSC, LLC for the acquisition and development of 81 condominium sites and 40 boat docks in Apollo Beach, Florida.

35. On June 27, 2007, USB closed the purchase of its sub-participation interest. The loan was secured by a first deed on condominium units and boat slips in Apollo Beach. Approving this loan violated the Loan Policy, underwriting

---

[1] Borrowers/guarantors are identified in this Complaint by their initials only in order to preserve their right to financial privacy afforded by applicable Georgia and federal banking laws. The Defendant, however, will be provided with the

requirements, and safe and sound banking practices in at least the following respects: (a) the Bank failed to perform any independent due diligence; (b) the Bank failed to obtain a credit report on the borrower; (c) financial statements for the borrower were not obtained; (d) personal guarantees were not obtained from all members in BSC, LLC; (e) no financial analysis was performed of guarantors; (f) the borrower lacked the ability to service the debt; and (g) the Bank failed to obtain other loan documentation required by the Loan Policy. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

### 2.    Example Transaction with the BVP, LLC Loan

36.    On November 10, 2005, BVP, LLC and USB executed a note in the amount of Seven Hundred Forty- Six Thousand, Four Hundred Dollars ($746,400). The purpose of the loan was to provide a construction loan to BVP, LLC for construction of a single family house on Lot 36 in Buckhead Preserve. A portion of this loan, approximately $367,000 was funded on November 14, 2005.

37.    The loan was not approved by the LC until December 21, 2006. However, Pierce Neese executed a Promissory Note on behalf of the Bank on November 10, 2005. The loan was secured by a first deed to secure debt of the

---

complete names of borrowers/guarantors.

10222153_1.DOC

property along with the personal guaranty of CS dated November 10, 2005. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: (a) failed to obtain LC approval before disbursing funds; (b) the loan was not approved by the Chief Credit Officer; (c) no global financial analysis was performed of the borrower and guarantor; (d) the Bank failed to obtain an "as-is" appraisal for the collateral for this loan; (e) the borrower failed to place any equity into the construction project; and (f) the Bank failed to obtain current credit reports on the borrower. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

38.     In addition to repeatedly approving loans which violated the Loan Policy and prudent underwriting, Neese and Bank officers and employees under his supervision, created documents which show that, at least, between November 10, 2005 and March 27, 2008, the loan approval process was repeatedly violated by, among other things, failing to create and sign Loan Approval Forms ("LAFs") that under the Bank's loan policy were required to be completed and signed *before* the loan was funded and failing to document loan approvals. In such instances the Bank funded the loan first without ensuring that the credit decision at origination was acceptable and the loan had been properly underwritten. The absence of LAFs

14

indisputably put Neese on notice that transactions were being approved in material violation of the Loan Policy. Yet, Neese took no steps to investigate their absence or correct it.

39.     Based upon the Neese's negligent and grossly negligent conduct described above, the FDIC has been damaged in the amount of at least $6.373 million.

## V.     CAUSES OF ACTION

### COUNT I

### NEGLIGENCE UNDER GEORGIA LAW

40.     The Plaintiff re-alleges and incorporates by reference each of the allegations in the above paragraphs as if fully set out in this count.

41.     Neese owed USB a duty of care under common law, O.C.G.A.§§ 7-1-490, 51-1-2, and other facets of Georgia law to exercise the diligence, care, and skill which ordinarily prudent persons would exercise under similar circumstances in like position. Also, Neese agreed and was obligated by statute, contract and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules and regulations, as well as all applicable rules and regulations of the Bank.

15

42.     Neese is not entitled to the application of the business judgment rule because he routinely failed to adequately inform himself of the relevant risks in connection with loans which he approved, he ignored regulator's warnings regarding loan underwriting and risk management deficiencies (¶ 24), repeatedly approved loans in violation of the Loan Policy and Parts 364 and 365 of the FDIC's Rules and Regulations (¶¶ 31-39), and by exposing the Bank to undue risk by over concentrating in CRE/ADC loans and purchasing participations without adequate risk management controls (¶¶ 13-19).

43.     Neese, as CEO, Chairman of the Board of Directors, and Chairman of the Loan Committee, among other duties, was responsible for the overall management of the Bank including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.     These duties included, but were not limited to:  ensuring that the Bank had adequate policies, procedures and internal controls relating to, among other things, ADC/CRE lending, that the Bank adhered to its lending and credit policies, loan approval process and loan and credit administration practices, and that the Bank complied with banking statutes/regulations, that the Bank complied with regulator directions

16

and heeded to its warnings, that the Bank did not make imprudent loans and extensions of credit as part of a plan to unreasonably grow the Bank and that he approved loans that complied with the Bank's loan policy and prudent and sound lending practices.     Neese, in fact, possessed great skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

44.     By his actions and inactions, as described specifically and generally herein, Neese, as an officer and director of the Bank, repeatedly failed and neglected to perform his duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of his statutory and common law duties of care, as follows:

> a.     Pursuing an aggressive ADC/CRE lending stratagem that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes and regulations, and prudent and sound lending practices;
>
> b.     Failing to ensure that the known risks inherent in high ADC/CRE loan concentrations were properly managed by management oversight, strategic planning, underwriting, risk assessment and monitoring of CRE/ADC loans, portfolio risk management, management information

17

systems, market analysis, and stress testing.

    c.    Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

    d.    Disregarding and failing to take appropriate steps to address regulator criticisms and heed their warnings;

    e.    Failing to ensure that ADC/CRE loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

    f.    Failing to implement and follow sound loan underwriting and credit administration practices;

    g.    Failing to implement prudent risk management strategies;

    h.    Failing to inform himself about the risks that the credit transactions posed to the Bank before he approved them;

    i.    Failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions;

    j.    Failing to ensure that the credit transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

18

10222153_1.DOC

k.     Approving credit transactions that caused the Bank to exceed the Bank's relevant concentration limits;

l.     Failing to ensure that Bank management followed the Loan Policy; and,

m.    Failing to properly supervise, manage, and oversee the Bank's loan operations.

45.    As a direct and proximate result of the Neese's negligence and abuses of discretion, the FDIC-R suffered damages, at an amount of at least $6.373 million as may be proven at trial.

## COUNT II

## GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. § 1821(K)

46.    The Plaintiff re-alleges and incorporates by reference each of the allegations in paragraphs 1-39, as if fully set out in this count.

47.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that degree of care

19

which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

48. In the alternative, the acts and omissions of the Neese, described particularly in paragraphs 20-28 and 31-39 of this Complaint, and especially for Damages occurring after disregarding regulator's warnings and criticisms regarding loan underwriting, risk management and loan concentrations (¶ 24); approving loan, credit extension transactions and loan participations that failed to comply with the Bank's policy and safe and sound lending practices, (¶¶ 29-39) and; allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans in order to rapidly grow the Bank without adequate risk management controls (¶¶ 13-19) which warnings were effectively ignored and after the housing market deteriorated, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

49. Neese acted with gross negligence in operating the lending function of the Bank by, among other things, approving credit transactions that failed to comply with its policy and safe and sound lending practices; repeatedly abdicating his responsibilities to the Bank by unreasonably failing to investigate material

20

facts, by not acting in good faith and approving credit transactions without being reasonably well informed; in failing to follow the loan approval process, in approving loans in violation of the loan policy and Parts 364 and 365 of the FDIC's Rules and Regulations, and in ignoring warning by regulators regarding overconcentration and underwriting deficiencies, and by ignoring the danger and risks the careless credit approvals were causing the Bank, and exhibiting such a degree of carelessness and/or inattention as to constitute an abuse of discretion and, thus, gross negligence under Georgia law.

50.     As a direct and proximate result of the Neese's gross negligence, the FDIC-R suffered damages, at an amount of at least $6.373 million as may be proven at trial.

## VII.  **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Federal Deposit Insurance Corporation, as Receiver for United Security Bank, demands a trial by jury and judgment in its favor against the Defendant as follows:

1.     For compensatory damages and other damages against the Defendant for his negligence and/or gross negligence that resulted in Damages;

2.     For prejudgment and other appropriate interest pursuant to 12 U.S.C. Sec. 1821(l);

21

3.      Such other and further relief as the Court deems just and proper; and

4.      Plaintiff demands a trial by jury on all issues.

10222153_1.DOC

Respectfully submitted this 23rd day of October, 2012.

**MILLER & MARTIN PLLC**

By: _Michael P. Kohler_

Charles B. Lee
Georgia Bar No. 443095
Michael P. Kohler
Georgia Bar No. 427727
Laura Ashby
Georgia Bar No. 595907

1170 Peachtree Street, N.E.
Suite 800
Atlanta, GA  30309-7706
Telephone: (404) 962-6100
Facsimile: (404) 962-6300
Email:  clee@millermartin.com
mkohler@millermartin.com
lashby@millermartin.com

and

Ellis A. Sharp
*To be Admitted Pro Hac Vice*
Tennessee Bar No. 005070
STOKES, WILLIAMS, SHARP & DAVIES
920 Volunteer Landing Lane, Suite 100
Post Office Box 2644
Knoxville, TN  37901
(865) 544-3833
(865) 544-1849 (fax)
sandy@stokeswilliams.com

***Attorneys for Plaintiff Federal Deposit Insurance Corporation, as Receiver for United Security Bank***

23

**EXHIBIT A**

| The 16 Loans | | | |
|---|---|---|---|
| **Borrower** | **Loan Amount ($ millions)** | **Approval Date** | **Deficiencies** |
| 1.  OH, LLC −5005 | $.404 | April 21, 2006 | 4, 5, 7 |
| 2.  OH, LLC-5006 | $.376 | April 21, 2006 | 4, 5, 7 |
| 3.  OH, LLC-5007 | $.404 | April 21, 2006 | 4, 5, 7 |
| 4.  OH, LLC-5008 | $.376 | April 21, 2006 | 4, 5, 7 |
| 5.  BSC, LLC-3305 | $2.000 | June 15, 2007 | 1, 2, 4-9 |
| 6.  GC, Inc.-5007 | $.345 | May 8, 2007 | 2-5, 8, 9 |
| 7.  JJ-39010 | $.281 | Aug. 3, 2006 | 3-9 |
| 8.  NCD, LLC-5023 | $.579 | April 10, 2007 | 2-9 |
| 9.  PSF, LLC -5506 | $.559 | April 10, 2007 | 3-9 |
| 10.HD, LLC-9016 | $2.339 | Dec. 27,2007 | 2, 4-7 ,9 |
| 11.A&C, LLC.-5004 | $.746 | Nov. 10, 2005 | 3-7 ,9 |
| 12.BVP, LLC-5004 | $.746 | Nov. 10,2005 | 2, 4-9 |
| 13.LCG, LLC-5003 | $.746 | Nov. 10, 2005 | 2, 4-9 |
| 14.FG, LLC- 5001 | $1.650 | March 27, 2008 | 1, 2, 4-7, 9 |
| 15.OMR, LLC-9001 | $.922 | Sept. 6, 2007 | 2-5, 7, 9 |
| 16.BS, LLC-5001 | $1.000 | May 30, 2006 | 1, 2, 4-6, 9 |
| **TOTAL** | **$13.470** | | |

Borrowers/guarantors are identified in this Complaint by their initials only in order to preserve their right to financial privacy afforded by applicable Georgia and federal banking laws.  The Defendant, however, will be provided with the complete names of borrowers/guarantors.

10222153_1.DOC

| Key to Fourth Column ("Deficiencies") in the Table | |
| --- | --- |
| 1 = purchased participation without conducting independent diligence | 5 = no sound financial analysis of guarantor(s) |
| 2 = loan lacked sound repayment sources | 6 = guarantor(s) lacked ability to service/repay debt |
| 3 = LTV / LTC ratio limit violation | 7 = appraisal inadequate, not obtained or reviewed |
| 4 = no sound financial analysis of borrower | 8 = ADC loan lacked complete analysis |
| | 9 = collateral inadequate |

25